Peter R. Silverman, Esq.
Donald F. Schneider, Esq.
Silverman Shin & Byrne PLLC
88 Pine Street, 22nd Floor
New York, NY 10005
Tel.: 212-779-8600

*Special Litigation Counsel to 45 John Lofts LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X

IN RE:                                          Chapter 11

45 JOHN LOFTS LLC,                              Case No.: 16-12043 (SHL)

                      Debtor,
------------------------------------------------------------
45 JOHN LOFTS LLC,                              **COMPLAINT**

                      Plaintiff,

              -against-

BLAIVAS & ASSOCIATES, P.C., DAVID               Adv. Pro. No. _____(SHL)
BLAIVAS AND YISROEL SCHWARTZ,

                      Defendants.
------------------------------------------------------------ X

        Plaintiff, 45 John Lofts LLC ("Debtor") by its attorneys, Silverman Shin & Byrne PLLC,

as and for its complaint against the Defendants, sets forth and alleges:

## PRELIMINARY STATEMENT

        1.      This action arises from the negligence and breaches of professional duties owed to

the Debtor by its former attorneys, Defendants Blaivas & Associates, P.C. ("Blaivas"), Blaivas'

principal David Blaivas and Blaivas associate Yisroel Schwartz ("Schwartz") (collectively, the

"Defendants").  While simultaneously representing differing and indeed directly conflicting

interests in a $61.4 million sale transaction, the Defendants (i) negligently failed to disclose such conflicting interests and failed to represent and protect the interests of the Debtor, and (ii) aided and abetted massive breaches of fiduciary duties by the then co-manager of the Debtor, whom Defendants simultaneously represented, resulting in a loss to the Debtor of more than $20 million.

2.    Chaim Miller a/k/a Harry Miller ("Miller"), then a member and co-manager of the Debtor, and his undocumented agent and affiliate, Yechiel Shimon Sprei a/k/a Sam Sprei ("Sprei"), without the knowledge and consent of Miller's co-manager, clandestinely negotiated and entered into a contract to sell the real property which was the Debtor's sole asset, for the illicit purpose of funding Miller and Sprei's personal obligations in complete disregard of the interests of the Debtor.  Ignoring a clear conflict of interest, the Defendants represented the Debtor as well as Miller and Sprei individually in the negotiation and execution of a contract to sell the Debtor's real property to HS 45 John LLC (HS 45) and supervised the disbursement of the contract down payment to various third parties including the Defendants, to satisfy Miller and Sprei's personal debts and obligations.

3.    The contract was executed by Miller on September 19, 2014 as a manager of the Debtor and by Miller and Sprei individually as guarantors of various contract provisions including repayment of the down payment to HS 45 in the event it elected to terminate the contract.  In addition, the contract granted Miller an option to retain a majority interest in the Debtor to the exclusion of the other members of the Debtor.

4.    Without the required consent of the Debtor's co-manager and its members owning a majority of its interests, Miller caused the Debtor to contract to sell its sole asset for a below market price and without a customary escrow for a down payment of $14.33 million.  The

absence of an escrow for the down payment was necessary because Miller and Sprei intended to (and did thereafter) use the proceeds of the contract down payment to fund their personal obligations including a $31 million buy-out of their business partner's interests in ventures unrelated to the Debtor and avoid an imminent default and loss of their $8.5 million deposit under a time of the essence contract for the purchase of such interests.

5.       The Defendants, while representing the Debtor, also represented Miller and Sprei in negotiating and closing their personal time of the essence contract, and were well aware of the intended use of the $14.33 million down payment that belonged to the Debtor to fund Miller and Sprei's personal obligations.  Indeed, one day before both the deadline for Miller and Sprei's time of the essence contract, and the execution of the real property contract of sale on behalf of the Debtor, Defendant Schwartz wrote to the counsel for HS 45: "I am trying to make sure that Sam [Sprei] has all the funds he needs tomorrow morning, as I was able to get the other Seller's attorney to agree to hold off until noon tomorrow before I [sic] failure to fund today becomes a default."  Defendants, however, failed even to notify the Debtor's co-manager and its other members of such intended sale by the Debtor as well as Miller's breach of his fiduciary duty and the intended diversion of the Down Payment by Miller.

6.       Once the Debtor's co-manager learned of the contract of sale with HS 45 he promptly obtained injunctive relief halting the consummation of the sale, following which HS 45 filed for bankruptcy protection seeking specific performance of its contract.  However, it was too late to prevent the diversion of the down payment proceeds which have never been recovered. Following multi party litigation in the HS 45 bankruptcy, the Debtor's sole asset was sold at a bankruptcy auction at a distressed price, albeit more than $11 million higher than the fire sale price Miller contracted to sell it for, with the lion's share of the proceeds going to HS 45 and to

satisfy the Debtor's outstanding mortgage debt. The Debtor lost its sole asset and did not receive a cent for its property.

7.     The wrongful conduct by Miller and Sprei could not have been accomplished without the substantial assistance of the Defendants, which resulted in a loss to the Debtor in excess of $20 million. The Debtor would not have incurred such loss but for the negligence, conflict of interest and other misconduct of the Defendants.

## THE PARTIES

8.     The Debtor is a New York limited liability company formed on February 21, 2014 under the New York Limited Liability Company Law for the purpose of acquiring an 84 unit condominium building located at 45-49 John Street, New York, New York.

9.     Defendant Blaivas is a New York domestic professional corporation engaged in the practice of law. On its website, Blaivas touts itself as a "boutique firm specializing in one niche area of the law: real estate [providing] counsel on complex commercial real estate transactions".

10.     Upon information and belief, at all times relevant herein, Defendant David G. Blaivas was and still is an attorney admitted to practice in the State of New York and the principal of Blaivas.

11.     Upon information and belief, at all times relevant herein, Defendant Schwartz was and still is an attorney admitted to the practice of law in the State of New York and is an associate and employee of Blaivas.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

13.     This adversary proceeding is commenced pursuant to Rule 7001, *et seq.* of the Federal Rules of Bankruptcy Procedure and Section 544 of Title 11 of the United States Code.

14.     Venue in this Court is proper pursuant to 28 U.S.C. §1409 because this proceeding arises under, and is in connection with, a case under 11 U.S.C. § 101, *et seq*.

15.     This is a "core" proceeding pursuant to 28 U.S.C. §157(b)(2)(A) and (O).

16.     Should the Bankruptcy Court determine that this is a non-core proceeding, the Debtor consents to the issuance by the Bankruptcy Court of recommendations containing proposed findings of fact and conclusions of law to the District Court.

### ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### Formation of the Debtor and Purchase of its Real Property

17.     The Debtor's sole asset was a vacant eighty four unit condominium located at 45-49 John Street, New York, New York designated on the Official Tax Map of The City of New York, New York County, respectively, as Block 78, Lots 1701-1787 f/k/a Block 78, Lot 28 (the "Property") which was purchased by the Debtor from MRC Re Holdings LLC in March 2014 (the "MRC Contract").

18.     Blaivas negotiated the terms of the MRC Contract on behalf of the Debtor and represented the Debtor in closing title for the Property and financing its purchase price.

19.     The Debtor financed the purchase of the Property with three mortgage loans in the aggregate principal amount of $49.5 million (the "Madison Mortgage Loans") from affiliates of Madison Realty Capital ("Madison"), a lender with which Miller and Sprei had financed several other real estate transactions.

20.     As a requirement for the three Madison Mortgage Loans, Blaivas issued three opinion letters in a form customary for commercial mortgage financing transactions, as special

counsel to the Debtor and as special counsel to Miller and Dong, each of whom executed personal guarantees of the Madison Mortgage Loans.

21.     Prior to his employment by Blaivas, Schwartz, as an associate of another law firm, had represented Miller and Sprei in several real estate transactions and continued to represent Miller and Sprei as an associate of Blaivas when he joined Blaivas in 2013.

22.     On February 28, 2014, the Debtor, Miller and Chun Peter Dong ("Dong") entered into an Operating Agreement (the "Operating Agreement") pursuant to which (i) Miller acquired a 68% Interest and Dong acquired a 32% Interest in the ownership, profits, losses and distributable cash flow of the Debtor; and (ii) Miller was designated as the Debtor's "initial manager".

23.     Upon information and belief, the Operating Agreement was drafted by Blaivas, pursuant to the request and at the direction of Miller and Sprei.

24.     As a condition to the Madison Mortgage Loans, the Debtor, Miller and Dong entered into a First Amendment to the Operating Agreement ("First Amendment") which included provisions typical to commercial mortgage financing.   The recitals to the First Amendment provide that:

> The individuals/entities signing this Amendment below agree to amend Operating Agreement as follows by adding the following provisions, which terms shall modify, amend and supersede any contrary terms of the Operating Agreement. [emphasis added]

25.     The First Amendment included the following provision:

> 3(b)   For so long as the [Madison Capital] Loan is outstanding, HARRY MILLER and CHUN PETER DONG, shall be the sole Member(s) and Managing Member(s) of the Company.

26.     The Madison Mortgage Loans remained outstanding at all times relevant herein.

27.    Blaivas represented the Debtor regarding the First Amendment.

28.    The Operating Agreement, which provided that the Debtor would be managed alone by Miller as the "initial manager", is silent regarding the conduct of the Debtor's business in the event the Debtor had more than one manager.

29.    Section 408(b) of the New York Limited Liability Company Law (NYLLCL) provides that:

> Except as provided in the operating agreement and in accordance with Section 419 of this Article, the managers shall manage the limited liability company by the affirmative vote of the majority of the managers.

30.    Since the Operating Agreement did not provide otherwise, under NYLLCL §408(b), the consents of both Miller and Dong as the Managing Members of the Debtor were required to approve any material act by or on behalf of the Debtor, a requirement which Miller, Sprei and the Defendants proceeded to ignore.

31.    Following the Defendants' representation of the Debtor regarding the purchase of the Property, the Operating Agreement and the First Amendment, the Defendants continued their representation of the Debtor, which representation included the sale of the Debtor's air rights, an attempted refinancing of the Madison Mortgage Loans and ultimately the contract to sell the Property and disbursement of the Contract down payment.

32.    While representing the Debtor, the Defendants continued their representation of Miller and Sprei individually in connection with other real estate ventures.

### The 41% Investors and the Recorded Amendment to the Operating Agreement

33.    Although the Debtor's Operating Agreement required Miller to obtain Dong's prior consent for any transfer or sale of Miller's interest in the Debtor, Miller, together with Sprei, and without Dong's knowledge or consent, entered into numerous transactions with

various investors, which resulted in the acquisition by such investors of 41% from Miller's 68%

interest in the Debtor, leaving Miller with a minority 27% interest.

34.     On June 5, 2014, the investors who had collectively acquired a 41% interest in the

Debtor from Miller (the "41% Investors"), recorded an amendment to the Company's Operating

Agreement with the City Register (the "Recorded Amendment").

35.     The Recorded Amendment provides, at section 2(a), that

> Notwithstanding anything to the contrary, the Manager may
> not make any major management decisions (as defined
> below) without obtaining the written consent of a majority
> interest of the Members.

36.     "Major management decisions" is defined in the Recorded Amendment to include

the sale or transfer of any interest in the Property.   A schedule annexed to the Recorded

Amendment lists the members of the Debtor and their respective membership interests as

follows:

| | |
|---|---|
| Chun Peter Dong | 32% |
| Wing Fung Chau | 20.5% |
| Tu Kang Kang | 20.5% |
| Harry Miller a/k/a Chaim Miller | 13.5% |

37.     Upon information and belief, Sprei negotiated the investments from the 41%

Investors, representing himself as a member and manager of the Debtor.

38.     The Recorded Amendment was signed by Miller, Sprei, and each of the other

parties referenced in paragraph 33 above, with the exception of Dong who was not a signatory to

the amendment.

39.     No explanation was provided by Sprei or Miller as to why one-half of Miller's

remaining 27% interest in the Debtor was attributed to Sprei in the Recorded Amendment.

40.    Pursuant to NYLLCL § 402(d)(2), the vote of a majority-in-interest of members of the Debtor was required to approve a sale or other transfer of the Property which constituted the only asset of the Debtor, a requirement which Miller, Sprei and the Defendants proceeded to ignore.

## DEFENDANTS' SIMULTANEOUS REPRESENTATION OF THE CONFLICTING INTERESTS OF THE DEBTOR AND OF MILLER AND SPREI, RESULTING IN SUBSTANTIAL DAMAGES TO THE DEBTOR

### a.    Defendants' Representation of Miller and Sprei in Negotiation of the Zhu Buy-Out Contract

41.    In the fall of 2014, Miller and Sprei were under substantial pressure to come up with funds in order to consummate a $31 million contract to buy out the membership interest of Miller's partner, Bo Jin Zhu ("Zhu"), in four limited liability companies (other than the Debtor), each owning a separate commercial property, and avoid the loss of their $8.5 million contract down payment.

42.    Specifically on May 12, 2014, Miller and Sprei, entered into a contract with Zhu's assignee, Renatus Portfolio Company ("Renatus"), to buy out Zhu's limited liability company interests (the "Zhu Buy-Out Contract") in companies which owned four Brooklyn properties: 97 Grand Avenue ("Grand Avenue"), 203-205 North 8th Street ("North 8th St."), 32-34 Fifth Ave. ("Fifth Avenue"), and 29 Ryerson Street ("Ryerson," and along with Grand Avenue, North 8th St. and Fifth Avenue, the "Buy-Out Properties"). Miller and Zhu were the sole members of the limited liability companies which owned the Buy-Out Properties, with the exception of Ryerson, in which Dong had previously acquired a 25% interest from Miller.

43.    Under the Zhu Buy-Out Contract Miller and Sprei had paid an initial deposit of $7 million against a purchase price of $31 million, with payment of the balance to be made by a time of the essence closing scheduled for August 11, 2014.

44.     As the August closing date for the Zhu Buy-Out Contract neared, Schwartz, on behalf of Miller and Sprei, negotiated an extension of the time of the essence closing date with Renatus from August 11 to September 15, 2014 in consideration of an additional deposit of $1.5 million.

**b.     Defendants' Simultaneous Representation of the Debtor, Miller and Sprei in Connection with the September 19, 2014 Agreement of Purchase and Sale of the Debtor's Sole Asset**

45.     Through the end of August 2014, Miller and Sprei were unable to raise the remainder of the purchase price needed to consummate the Zhu Buy-Out Contract.  Miller and Sprei then attempted to obtain the necessary funds by, among other things, contracting to sell the Property and refinancing three of the Zhu Buy-Out Properties and another property controlled by Miller.

46.     Facing a fast approaching deadline which required them to pay $22.5 million to Renatus in order to close their contract and avoid the loss of their $8.5 million down payment, Miller and Sprei commenced negotiations with HS 45 on or about September 9, 2014, initially for an investment in the Debtor in the form of a joint venture agreement with Miller and Sprei, to the exclusion of the other members of the Debtor.

47.     By September 15, 2014, however, despite frantic negotiations between Sprei, Miller and Schwartz on the one hand and HS 45 and its counsel on the other hand, the parties had failed to complete an agreement regarding an investment by HS 45 in the Debtor.

48.     On September 15, 2014, Schwartz, on behalf of Miller and Sprei, obtained a further three day adjournment from Renatus to September 18, to pay the $22.5 million balance of the purchase price under the Zhu Buy-Out Contract and avoid forfeiting their $8.5 million contract deposit.

49.     Schwartz and Sprei then proceeded to hastily negotiate an Agreement of Purchase and Sale ("PSA") of the Property between the Debtor, as seller, and HS, as purchaser.

50.     The Defendants represented the differing interests of the Debtor on one hand, and Miller and Sprei on the other, in connection with the negotiation and execution of the PSA and the disposition of the PSA down payment.

51.     Miller and Sprei's interest in the transaction was to procure sufficient funds to enable them to close under the Zhu By-Out Contract prior to the time of the essence deadline.

52.     Defendants had knowledge from, among other things, their representation of Miller and Sprei in connection with the Zhu Buy Out Contract, that Miller and Sprei desperately needed the funds to be generated by the PSA in order to fund the Zhu Buy-out Contract and that Miller intended to engage in conduct that was a violation of his legal and fiduciary obligations to the Debtor which would result in substantial injury to the Debtor.

53.     Defendants had a duty to deal fairly, honestly, in good faith and with undivided loyalty to the Debtor, and to avoid conflicts of interest, and to serve the Debtor competently.

54.     Defendants breached the foregoing duties by failing to inform the Debtor's co-manager and its other members of their simultaneous representation of the antagonistic interests of Miller and Sprei in connection with the PSA and the disposition of the down payment with respect thereto, let alone that Miller was attempting to sell the Property of the Debtor.

55.     Defendants also failed to inform the Debtor's co-manager or its other members of Miller and Sprei's intent to use the down payment from the PSA, which would belong to the Debtor, for their personal purposes.

56.     Defendants proceeded to negotiate and draft the PSA following initial negotiations by Miller, Sprei and Schwartz on behalf of the Debtor.

57.    The Defendants negotiated the extraordinary release of the PSA Down Payment without escrow with knowledge of Miller and Sprei's desperation and intent to use the PSA Down Payment proceeds for their own benefit.

58.    On September 18, 2014, Schwartz emailed Andrew Albstein ("Albstein"), lead counsel for HS 45: "I am trying to make sure Sam [Sprei] has all the funds that he needs tomorrow morning, as I was able to get the other Seller's attorney to agree to hold off until noon tomorrow before I failure [sic] to fund today becomes a default".

59.    The "other seller's attorney" referred to in Schwartz' email was Herrick Feinstein LLP, the attorneys representing Renatus (Zhu's assignee) in the Zhu Buy-Out Contract, with whom Schwartz had negotiated a further one day extension to noon on September 19.

60.    Contrary to the terms of the First Amendment and the Recorded Amendment, on September 19, 2014, following the hectic and frantic negotiations in which Defendants participated, representing the Debtor, Miller and Sprei simultaneously, Miller executed the PSA with HS 45 on behalf of the Debtor.

61.    The $64.5 million purchase price provided in the PSA (which, as will be referenced below, was artificially inflated) was negotiated by Sprei and Miller as a fire sale due to their desperate need of funds to close the requirements of the Zhu Buy-Out Contract.

62.    Critically, the PSA provided for the immediate release of the Down Payment free of a customary escrow.  The PSA also contained a built-in mechanism giving Miller an option to participate together with HS 45 as members of the Debtor (to the exclusion of Dong or the 41% Investors) in lieu of closing of title.

63.    Miller entered into the PSA without the knowledge or consent of either the Debtor's co-manager (Dong) or its other members, and without the required vote and consent of members holding a majority of interests in the Debtor.

64.    The PSA included the following provisions:

(a)    a purchase price consisting of $17.5 million and an amount equal to the unpaid principal balance of outstanding mortgage indebtedness not to exceed $47mMillion. However, the $17.5 million portion o the purchase price was artificially inflated by over $3 million which was credited back to HS 45, valuing the transaction at $61.5 million;

(b)    a down payment in the amount of $14,330,000 (the "PSA Down Payment") of which $13,300,000 was delivered to Riverside Abstract Company ("Riverside"), which served as a clearing agent for both the PSA transaction and the Zhu Buy-Out transaction, and $1,000,000 was disbursed directly by HS 45 to Meridian Capital Group LLC ("Meridian") ostensibly for a brokerage commission.  Extraordinarily, no escrow was provided for the PSA Down Payment and Riverside was directed to return $2,850,000 of the Down Payment to HS 45 and its counsel and deduct HS 45's title fees of $227,000.  (PSA §§ 3.2.1, 25, 28, 29)

(c)    the personal Guaranty of Miller and Sprei to repay the PSA Down Payment with interest at 16% per annum in the event HS 45 terminated the PSA "for any reason or no reason" (PSA § 25);

(d)    an option to enter into a joint venture agreement between HS 45 and Miller in the form of an Amended and Restated Operating Agreement of the Debtor in lieu of the transfer of title (PSA § 23 and Exhibit E thereto), in which event Miller would be a Class B Member with a 50.1% Membership Interest and HS 45 would have a 49.9% Class A Membership Interest in the Debtor; and

(e)     the payment of a "management fee" to HS 45 guaranteed by Miller and Sprei, in the amount of $104,166.66 per month, payable monthly in advance upon signing of the PSA, with late payment interest at 16% per annum (PSA § 24).  No explanation was given for the need of management services for the Property which consisted of a vacant building.

c.    **The Recorded Amendment Exception to Title**

65.    Riverside whose principal and Chief Executive Officer, Shaul Greenwald ("Greenwald"), had personally engaged in other real estate ventures with Miller and Sprei, and had previously worked with the Defendants insuring other real estate transactions, was selected by the Defendants as the title company to provide a vendee policy of title insurance to HS 45.

66.    HS 45 and its counsel required the issuance of the vendee title insurance as a condition to enter into the PSA and release the Down Payment without escrow.

67.    Compliance with the Recorded Amendment, which was included as an exception to title in Riverside's title report, became an obstacle, initially to the proposed joint venture, and later to the execution of the PSA.  Counsel for HS 45 advised Schwartz and Sprei that HS 45 would not proceed with the contemplated transaction unless the Recorded Amendment title exception was omitted from the HS 45 vendee title policy.

68.    On September 10, 2014, Sprei, in an email to Albstein which was copied to Schwartz, stated:  "We will get a termination [of the Recorded Amendment] and file it with the title company."

69.    On September 11, 2014, Schwartz emailed Albstein, stating: "I understand there is concern regarding the recorded 'operating agreement' and my client asked that I assure you that he will be obtaining releases from each of the parties listed therein."

70.    On the same day Schwartz, at Sprei's direction, drafted:

(a) a "Termination of First Amendment to Operating Agreement" (the "Termination Agreement") for execution by Dong, Sprei, Miller and the 41% Investors, and emailed the draft to Riverside with a cover note asking if the draft would be "sufficient to remove the recorded First Amendment to Operating Agreement", and

(b) a "Transfer and Assignment of Membership Interest" providing for Dong's sale of his 32% interest to Miller (the "Dong Assignment") together with an escrow agreement providing that Blaivas would hold the Dong Assignment in escrow.

71.     Schwartz testified in an adversary proceeding subsequently commenced by HS 45 in the Bankruptcy Court (the "HS Bankruptcy Litigation")[1] that he never communicated with either Dong or Dong's then attorney, Ann Hsiung ("Hsiung"), regarding negotiations with HS 45, the PSA, the Dong Assignment, or the Termination Agreement.

72.     Miller and Sprei never obtained the consent of the 41% Investors and/or Dong to either the Termination Agreement or the Dong Assignment and at all times withheld from Dong and the 41% Investors their plan to enter into a contract with HS 45 on behalf of the Debtor which would exclude Dong and the 41% Investors from further participation in the Debtor.

73.     On September 12, 2014, Schwartz began to backtrack on Sprei's promise to terminate the Recorded Amendment and obtain the Dong Assignment. In an email to counsel for HS 45, Schwartz stated:

> After further conversations with Sam, we would like to proceed as follows: 1. The complete business deal (including the final operating agreement) needs to be completed and funded in escrow; 2. Once we have final operating agreement, Sam will submit to the lender for their consent; 3. Once lender has signed off, we will be in a position to obtain the executed terminations/assignments from Peter Dong and the remainder of the individuals.

---

[1] All references to testimony herein refer to depositions taken in the HS Bankruptcy Litigation.

74.    Upon information and belief, the "business deal" as referenced in Schwartz' September 12 email was an initial proposal by Sprei and Miller for a joint venture between Miller and HS 45 to become partners in the ownership of the Debtor, with the assumption that Miller would acquire Dong's 32% interest.

75.    On September 17, 2014, following the abandonment of Miller and Sprei's joint venture proposal, and with the September 18 Zhu Buy-Out Contract deadline only one day away, Schwartz managed to obtain a final one day extension to close the Zhu Buy-Out Contract.

76.    On September 19, 2014, at the signing of the PSA, a title closer for Riverside removed the required compliance with the Recorded Amendment as an exception to title without explanation and issued the vendee title insurance policy to HS 45.

77.    Greenwald testified that the Recorded Amendment exception was removed based upon a conversation he had with Schwartz, although he could not recall any specifics or the substance of the conversation.

78.    Albstein testified that HS 45 would not have entered into the PSA without the removal of the Recorded Amendment exception and issuance of the vendee title insurance.

### d.    Defendants' Denial That They Represented the Debtor in Connection With the PSA

79.    Defendants at all times conducted themselves as the Debtor's counsel.  In his testimony, however, Schwartz claimed that the Defendants did not represent the Debtor regarding the sale of its sole asset in the PSA and that the Defendants represented only Miller in his capacity as manager of the Debtor and Sprei as Miller's agent in their dealings with HS 45. Incredibly, Schwartz claimed that the Debtor was not represented by any counsel in the transaction which provided for the sale of the Debtor's sole asset.

80.     Schwartz' denial of representation of the Debtor is belied by the totality of facts and circumstances which unequivocally demonstrate that the Defendants at all times represented the Debtor as its legal counsel in connection with the PSA and instructions concerning disposition of the PSA Down Payment.

81.     Miller testified under oath that Schwartz represented the Debtor as its counsel in the negotiation and execution of the PSA.  So too did Sprei and Albstein, lead counsel for HS 45, who testified that Schwartz' claim that he did not represent the Debtor in the PSA transaction was "incredible."

82.     Even the notice provision in the PSA which Schwartz drafted (PSA §14) requires that all notices to the Debtor be transmitted to Blaivas.

83.     When the PSA was executed, the Defendants were aware of (i) the Operating Agreement of the Debtor; (ii) the First Amendment to the Operating agreement, (iii) the Recorded Amendment; (iv) the fact that Dong held a 32% Interest in the Company; (v) the fact that Dong along with Miller were Managing Members of the Debtor; (vi) the fact that Miller held a minority interest in the Debtor; (vii) the fact that, pursuant to the Recorded Amendment, Miller could not enter into an agreement to sell the Property "without obtaining the written consent of a majority in interest of the Members"; and (viii) the fact that Miller and Sprei intended to use the PSA Down Payment to fund the Zhu Buy-Out Contract and satisfy their personal obligations.

84.     Notwithstanding such actual knowledge, the Defendants drafted the PSA for execution by Miller as manager of the Debtor, supervised the disbursement of the PSA Down Payment on behalf of Miller and Sprei, and failed to disclose the PSA transaction to either the Debtor's co-managing member or its other members.

85.     Schwartz claimed in his deposition in the Bankruptcy Litigation that he failed to disclose the PSA transaction to either Dong or the 41% Investors because Sprei had assured him that Miller and Sprei intended to buy out the interests of such investors, an assurance which Schwartz negligently failed to confirm.

86.     Upon information and belief, the Defendants negligently counseled Miller that he had authority alone as manager to execute the PSA, and knew or should have known when they drafted and negotiated the terms of the PSA that Miller falsely represented to HS 45 that (i) execution of the PSA and sale of the Property were duly authorized by all requisite action of the Debtor; and (ii) that the Debtor was not subject to any restriction or agreement which prohibited it from consummating the sale of the Property. (PSA § 7.1.1)

e.     **Defendants Represented Miller and Sprei in their Collateral Financing and Orchestrated the Simultaneous Closing of the PSA, the Zhu Buy-Out Contract and the Collateral Properties Financing**

87.     In addition to the remaining balance of $22.5 million owed by Miller and Sprei to Renatus under the Zhu Buy-Out Contract, Miller and Sprei needed at least an additional $7.5 million to pay other personal obligations and satisfy various obligations under the PSA.

88.     To provide such funds, Miller and Sprei arranged for mezzanine financing from Madison on three of the Zhu Buy-Out Properties (Ryerson, Grand and North 8th) and a fourth property which Miller controlled (the "Collateral Properties Financing"). The financing netted Miller and Sprei the sum of $16,073,911 in addition to the PSA Down Payment proceeds from the PSA.

89.     At the Defendants' request, in addition to providing vendee title insurance for the PSA, Riverside also provided title insurance to Madison for the Collateral Properties Financing.

90.    The Defendants represented Miller and Sprei regarding the Collateral Properties Financing from Madison and orchestrated the simultaneous closings of the PSA, the Zhu Buy-Out Contract and Collateral Properties Financing.

91.    One of the Collateral Properties (the "Ryerson Property") was owned by a limited liability company in which Dong held a minority interest and whose consent Madison required to complete its financing.    Dong withheld consent, demanding his interest in such property be bought out by Miller.

92.    At the same time that Schwartz was orchestrating the funding of the Zhu Buy-Out Contract together with the transmission of the PSA Down Payment to a third party, Schwartz was dealing with Anne Hsiung, Dong's then counsel, for the purchase of Dong's interest in the Ryerson Property.    Nevertheless, Schwartz failed to disclose to Hsuing or Dong any information regarding the transaction between the Debtor and HS 45.

**f.    Disbursement of the PSA Down Payment
and Collateral Properties Financing**

93.    On or about September 19, 2014, upon execution of the PSA, the PSA Down Payment and the proceeds of the Madison Collateral Properties Financing were wired to Riverside, which acted as a clearing agent for both transactions.

94.    A "Direction Letter" signed by Miller and annexed as an exhibit to the PSA, directed HS 45 to pay $1,000,000 from its $14,330,000 PSA Down Payment directly to Meridian, purportedly for brokerage fees for the sale of the Property, and to wire the $13,330,000 balance to Riverside.

95.    The Direction Letter further instructed Riverside to wire (i) $9,750,000 "at the direction of" the Debtor; (ii) $2,850,000 back to HS 45 and its counsel; (iii)   an additional $500,000 to Meridian; and (iv) $227,000 to Riverside for HS 45's title fees.

96.    On September 19, 2014, the same day that the PSA was signed, in addition to the $13,330,000 PSA Down Payment funds received by Riverside from HS 45, Riverside also received the sum of $16,073,911.98 from Madison as the proceeds from the Collateral Properties Financing.

97.    Madison wired its funds to Riverside with instructions to hold the funds in escrow until Miller and Sprei provided an additional $6,426,088.02 to Riverside, for a total of $22,500,000 – a sum that was required to fund the Zhu Buy-Out Contract.

98.    On September 19, 2014, the Defendants, as counsel for Miller's limited liability companies which owned the four Collateral Properties, provided Riverside with a letter of instruction (the "Break Escrow Letter"), stating as follows:

> We represent 11-45 Ryerson MB LLC, 11-45 Ryerson Holdings LLC, 3052 Brighton First, LLC, 3052 Brighton MB LLC, 97 Grand MB LLC, 203-205 North 8th Street Loft LLC and 203-205 N8 MB LLC (collectively, "Borrower"). Pursuant to that certain escrow instructions letter ("Escrow Letter"), dated as of the date hereof, by and between Kriss & Feuerstein LLP ("Lender's Counsel") and Riverside Abstract LLC ("Title Company"), you are in receipt of funds in the amount of $16,073,911.98 (the "Lender's Funds"). Additionally, you are in receipt of funds from an affiliate of Borrower in the amount of $6,426,088.02 (the "Borrower's Funds"). Upon the break of escrow pursuant to the Escrow Letter, you are directed to distribute the Borrower's Funds and the Lender's Funds as follows:
>
> 1)  $19,672,687.23 by wire to Herrick Feinstein . . .
>
> 2)  $2,827,312.77 by wire to Mega International . . ."

99.    The "Affiliate of Borrower" in the Break Escrow Letter which Defendants authored is a reference to the Debtor for which Riverside had been funded the PSA Down Payment proceeds.

100.    The sum of $19,672,687.23 which the Defendants instructed Riverside to wire to

Herrick Feinstein, together with the $2,827,312.77 wire to Mega International, totaled the

$22,500,000 balance due under the Zhu Buy-Out Contract.

101.    On September 19, shortly prior to the Defendants' Break Escrow Letter, Schwartz

sent Riverside two emails in quick succession, stating:

2:28 p.m.       "…You will be receiving $9,750,000 from Albstein.
                [HS 45's counsel]   Upon receipt, please confirm to
                Feuerstein [Madison's counsel] that you are in receipt
                of $6,500,000 of Borrower's funds so that they may
                fund the balance. Once you are in receipt of all funds
                please contact me for additional info."

3:15 p.m.       "After we take care of the $22,500,000 [balance due to
                Renatus]. $2,823,912.98 will be left.  In addition you
                will have $1,750,842 delivered for the title invoices…
                From this money, please send $500,000 to Reliable
                Abstract, please send $2,332,000 to 3839 Funding and
                please send $2,000,000 to Babad.  I will forward his
                instructions separately.  The balance of $242,000
                should be sent to Blaivas."

102.    The wires Schwartz directed to Reliable, 3839 Funding, Babad and to Blaivas

were in payment of various obligations of Miller and Sprei and not for the benefit of the Debtor.

103.    Riverside has provided conflicting information regarding the recipients of the

Debtor's funds which Riverside ultimately disbursed.

104.    Following receipt of Schwartz' September 19 email, Greenwald instructed his

staff in an email on which Schwartz was copied: "Let Yisroel [Schwartz] forward to whomever

he needs.  Don't do anything else without his request."

105.    With the possible exception of $500,000 wired to Meridian as a purported

brokerage fee, the entire $9,750,000 portion of the HS 45 Down Payment which was subject to

distribution "at the direction of the [Debtor]" was distributed by Riverside at Defendants'

instruction for the sole personal benefit of Miller and Sprei.  No part of the PSA Down Payment was used for the benefit of the Debtor.

       **g.**      **The Ensuing HS 45 Bankruptcy Litigation**

106.    Despite Sprei's instructions to the contrary, Riverside recorded a memorandum of the PSA with the New York City Register.

107.    Upon learning, as a result of Riverside's public filing, that Miller had entered into a contract of sale for Debtor's Property without Dong's knowledge, Dong's representative, demanded that the Defendants provide Dong with a copy of the contract and the status of the contract down payment.

108.    Schwartz rejected the demand, asserting the Defendants could not release any information without the approval of Miller and Sprei, even though Dong was a co-manager and 32% Interest holder of Debtor.

109.    Thereafter, on February 18, 2015, Dong commenced an action individually and derivatively on behalf of the Debtor in the New York Supreme Court, New York County seeking, *inter alia,* to enjoin the sale of the Property.  After a temporary restraining order was issued enjoining the sale, HS 45 filed a Chapter 11 petition and commenced an adversary proceeding in the United States Bankruptcy Court for specific performance of the PSA.

110.    Following extensive litigation involving multiple parties in the HS Bankruptcy Litigation, the Court approved a global settlement agreement among the parties to the litigation and a Plan of Reorganization by HS 45, which resulted in the eventual sale of the Property to a third-party purchaser for $73 million under distressed sale circumstances.

111.    After payment of administration expenses, most of the proceeds of the distressed sale were paid to satisfy the Madison Mortgage Loans ($53 million) and to HS 45 for the PSA

rights ($13.5 million). The remaining proceeds were paid to Dong and the 41% Investors in satisfaction of their claims against HS 45 and for payment of sale expenses in the bankruptcy.

112.    But for Defendants' negligence and their aiding and abetting Miller's breaches of duty, the sale of the Property in the ordinary course would have resulted in net proceeds to the Debtor of not less than $20 million (a minimum documented sales price of $73 million under distressed circumstances, less $53 million for payment of the Madison Mortgage Loans). The Debtor lost its sole asset and was left with nothing following Miller's execution of the PSA for a below market price and diversion of the PSA Down Payment to satisfy his own personal obligations.

### FIRST CAUSE OF ACTION
#### (Legal Malpractice – Conflict of Interests)

113.    The Debtor repeats and realleges the allegations of paragraphs 1 through 112 above, as if fully set forth herein.

114.    Defendants simultaneously represented the differing and irreconcilable interests of the Debtor on the one hand, and Miller and Sprei on the other, in connection with the PSA and the disposition of the PSA Down Payment.

115.    Defendants' dual representation of differing and in fact directly conflicting interests created not only the possibility but the actual eventuality that the Defendants' judgment and loyalty would be severely compromised, to the detriment of the Debtor.

116.    Defendants' simultaneous representation of clients whose interests were antagonistic to each other created an unwaivable conflict of interest.

117.   Defendants failed and neglected to inform the Debtor's co-manager and its other members of their simultaneous representation of the antagonistic interests of Miller and Sprei in connection with the PSA and the disposition of the PSA Down Payment.

118.   As attorneys for the Debtor, knowing that Miller and Sprei were in the process of engaging in conduct, in a matter related to Defendants' representation, which is a violation of a legal obligation owed to the Debtor, and which conduct was likely to result in substantial injury to the Debtor, Defendants failed and neglected to proceed as was reasonably necessary in the best interest of the Debtor.

119.   The Debtor was damaged as a result of the foregoing.

120.   But for the foregoing conduct by the Defendants and their failures to act, the Debtor would not have suffered the loss of its Property or the PSA Down Payment.

121.   As a result of the foregoing, the Debtor has been damaged in an amount to be determined at trial, but not less than $20 million.

## SECOND CAUSE OF ACTION
### (Legal Malpractice –Negligent Exercise of Duty of Care)

122.   The Debtor repeats and realleges the allegations of paragraphs 1 through 121 above, as if fully set forth herein.

123.   As the Debtor's attorneys, the Defendants owed to the Debtor a duty of care to exercise that degree of skill and knowledge commonly possessed by a member of the legal profession.

124.   The Defendants were negligent and failed to exercise that degree of skill and knowledge commonly possessed by a member of the legal profession in their representation of the Debtor.  Such negligence included but was not limited to (a) neglecting to inform the

448815-10                                          24

Debtor's co-manager and its other members of Miller's intended sale of the Property; (b) neglecting to advise the Debtor's co-manager and other members of Miller's intended fiduciary duty breaches, including his intended use of the PSA Down Payment for his and Sprei's personal purposes; (c) neglecting to counsel Miller that he did not have authority to enter into the PSA on behalf of the Debtor without the consent of the Debtor's co-manager and without a vote of a majority-in-interest of the Debtor's members; and (d) neglecting to act to protect the Debtor's interests in its receipt of the PSA Down Payment.

125.    As a direct result and proximate cause of the Defendants' failure to exercise the required duty of care, the Debtor was damaged and is entitled to recover the full amount of damages the Debtor would not have incurred but for the Defendants' negligence.

126.    As a result of the foregoing, the Debtor has been damaged in an amount to be determined at trial, but not less than $20 million.

### THIRD CAUSE OF ACTION
#### (Aiding and Abetting Breaches of Fiduciary Duty)

127.    The Debtor repeats and realleges the allegations of paragraphs 1 through 126 above, as if fully set forth herein.

128.    As a co-manager of the Debtor, Miller owed fiduciary duties to the Debtor including, without limitation, a duty of undivided loyalty, a duty not to act in a manner contrary to the interests of Debtor, and a duty not to obtain an improper advantage at the Debtor's expense.

129.    The Defendants had actual knowledge that Miller was a co-manager of the Debtor and of the fiduciary duties owed by Miller to the Debtor.

130.    With knowledge of Miller's fiduciary duty to the Debtor, Defendants provided substantial assistance to Miller in his breaching his fiduciary duties to the Debtor, by negotiating and drafting the PSA for a below market value price and with the substantial PSA Down Payment to be released free of an escrow, with knowledge that Miller was entering into the PSA for the purpose of funding his personal obligations; by assisting Miller and Sprei in concealing from the Debtor's co-manager as well as its other members, the negotiations for and execution of the PSA; by convincing Riverside to omit its title exception regarding the Recorded Amendment, which enabled Miller to enter into the PSA, triggering the funding of the PSA Down Payment; by assisting the transmittal of the PSA Down Payment to third-parties; by orchestrating the pooling of the PSA Down Payment with the proceeds of the Madison Collateral Properties Financing and assisting the disbursement of such funds for Miller and Sprei's personal benefit; by neglecting to counsel Miller that he did not have authority to enter into the PSA without the consent of his co-manager and without a vote of a majority-in-interest of the Debtor's members; and by failing to notify and concealing from the Debtor's co-manager or its other members, Miller's intended conduct, including intended breaches of his fiduciary duties to the Debtor.

131.    But for the substantial assistance of the Defendants, Miller would not have been able to engage or succeed in the conduct that breached his fiduciary duties and caused substantial damage to the Debtor.

132.    As a result of the Defendants' aiding and abetting Miller's breaches of his fiduciary duties owed to the Debtor, the Debtor has been damaged in an amount to be determined at trial, but not less than $20 million.

133.    Defendants' conduct as aforesaid was wanton, willful and malicious.

134.    By reason of the foregoing, punitive damages should be assessed against Defendants in an amount to be determined by the trier of fact.

## FOURTH CAUSE OF ACTION
## AGAINST DEFENDANT DAVID BLAIVAS

135.    The Debtor repeats and realleges the allegations of paragraphs 1 through 134 above, as if fully set forth herein.

136.    At all relevant times, Defendant David Blaivas, an attorney, was the sole principal, partner and manager of Blaivas, a law firm which consisted of David Blaivas and no more than three non-partner associate attorneys, including Schwartz.

137.    At all relevant times, Schwartz was under the direct supervision and control of David Blaivas while rendering professional services on behalf of the Blaivas firm.

138.    David Blaivas personally benefitted from Schwartz' conduct as aforesaid in that, according to Schwartz' testimony, $242,000 of the PSA Down Payment earmarked for the Blaivas firm in Schwartz' 3:15p.m. email of September 19, 2014 was wired at the instruction of David Blaivas to an investment entity in which he was an investor. According to Schwartz, such payment was for Defendants' representation of Miller and Sprei in various matters, which Schwartz did not identify with any specificity when asked at his deposition.

139.    By reason of the foregoing, Defendant David Blaivas is liable for the negligent and wrongful conduct of Schwartz in rendering professional services on behalf of the Blaivas firm.

140.    By reason of the foregoing, judgment should be entered in favor of Plaintiff and against Defendant David Blaivas in an amount to be determined at trial, but not less than $20 million.

## FIFTH CAUSE OF ACTION
## AGAINST DEFENDANT DAVID BLAIVAS

141.   The Debtor repeats and realleges the allegations of paragraphs 1 through 140 above, as if fully set forth herein.

142.   Defendant David Blaivas had an absolute non-delegable duty to supervise and control Defendant Schwartz in the performance of legal services on behalf of the Debtor.

143.   Upon information and belief, defendant David Blaivas exercised direct supervision and control of the creation and implementation of the procedures of the Blaivas firm needed to comply with its ethical obligations and avoid unwaivable or unwaived conflicts of interest.

144.   Defendant David Blaivas was negligent (a) in either failing to properly supervise Schwartz in his rendition of legal services in connection with the PSA and the disposition of proceeds thereof and in compliance with his and the Blaivas firm's ethical obligations, or failing to provide any such supervision over Schwartz, and (b) in the creation and/or implementation of procedures of the Blaivas firm to prevent undertaking client representation despite the existence of unwaivable or unwaived conflicts of interests.

145.   The Debtor has suffered damage as a result of the conduct of David Blaivas as aforesaid.

146.   Upon information and belief, David Blaivas, having management responsibility at the Blaivas firm and direct supervisory authority over Schwartz, failed to make reasonable efforts to ensure that Schwartz complied with the New York Rules of Professional Conduct and did not negligently perform his services on behalf of the Debtor.

147.   But for the negligence and neglect of David Blaivas as aforesaid, the Debtor would not have lost PSA Down Payment proceeds or lost its Property with no payment therefore.

148.   By reason of the foregoing, judgment should be entered in favor of Plaintiff and against Defendant David Blaivas in an amount to be determined at trial, but not less than $20 million.

WHEREFORE, Debtor demands judgment in its favor and against Defendants as follows:

(i)    On its First Cause of Action, in an amount to be proven, not less than $20 million, with interest at the legal rate accrued and accruing thereon;

(ii)   On its Second Cause of Action, in an amount to be proven, not less than $20 million, with interest at the legal rate accrued and accruing thereon;

(iii)  On its Third Cause of Action, in an amount to be proven, not less than $20 million, with interest at the legal rate accrued and accruing thereon, and punitive damages in an amount to be determined by the trier of fact;

(iv)   On its Fourth Cause of Action, against Defendant David Blaivas in an amount to be proven, not less than $20 million, with interest at the legal rate accrued and accruing thereon;

(v)    On its Fifth Cause of Action, against Defendant David Blaivas in an amount to be proven, not less than $20 million, with interest at the legal rate accrued and accruing thereon; and

(vi)   Granting such other and further relief as the Court may deem just and proper in the circumstances, including the costs and disbursements of this action.

Dated:  New York, New York
        October 10, 2016


                                SILVERMAN SHIN & BYRNE PLLC

                                By: _____
                                        Peter R. Silverman (3225)
                                        Donald F. Schneider (9886)
                                Attorneys for Plaintiff
                                88 Pine Street, 22nd Floor
                                New York, New York 10005
                                (212) 779-8600